1

2

3

4

5

6

7

8                      **UNITED STATES DISTRICT COURT**

9                      **CENTRAL DISTRICT OF CALIFORNIA**

10

11

12   SAM RUBIN ENTERTAINMENT,      )   CV 16-6431-RSWL-SSx
     INC.                          )
13                                 )
                                   )   **ORDER re: DEFENDANT**
14              Plaintiff,         )   **AARP, INC.'S MOTION TO**
                                   )   **DISMISS FIRST AMENDED**
15                                 )   **COMPLAINT** [21]
                                   )
16       v.                        )
                                   )
17   AARP, INC., and DOES 1-10,    )
                                   )
18              Defendants.        )
                                   )
19                                 )
                                   )
20   _____)

21       Currently before the Court is a Motion by Defendant

22   AARP, Inc. ("AARP") to Dismiss Plaintiff Sam Rubin

23   Entertainment, Inc.'s ("Plaintiff") First Amended

24   Complaint pursuant to Federal Rule of Civil Procedure

25   12(b)(6) ("Motion" or "Motion to Dismiss").  ECF No.

26   21.  For the reasons set forth below,  the Court **GRANTS**

27   **in part** and **DENIES in part** AARP's Motion.

28   ///

                                    1

# I. BACKGROUND

**A.   <u>Factual Background</u>**

Plaintiff is a California corporation that serves as a full-time production company.  First Am. Compl. ("FAC") ¶¶ 1, 9, ECF No. 18.  Sam Rubin ("Rubin"), a television producer and entertainment reporter for the KTLA morning news, is Plaintiff's founder and owner. <u>Id.</u> at ¶¶ 7, 9.  AARP is a Washington, D.C. corporation that has sponsored the "Movies for Grown-Ups Awards" ("MFGAs") since 2002.  <u>Id.</u> at ¶¶ 2, 10.[1]  The MFGAs are a ceremony recognizing films geared towards moviegoers over 50 years old.  <u>Id.</u> at ¶ 10.

Sometime in 2014, Rubin met with AARP's representative Bill Newcott ("Newcott") and offered to joint venture with AARP to produce the MFGAs for television on KTLA.  <u>Id.</u> at ¶¶ 11, 13.  During negotiations, Rubin wanted a long-term production commitment.  <u>Id.</u> at ¶ 16.  Rubin produced the 2015 MFGAs for KTLA, incurring all costs and securing sponsors, among other things.  <u>Id.</u> at ¶ 18.

Around March 2015, Rubin and another entertainment producer, Robb Weller ("Weller") met with several AARP representatives in Washington, D.C.  <u>Id.</u> at ¶ 23.  The

---

[1] Plaintiff has also included Does 1 through 10 in its First Amended Complaint ("FAC"), whose "true names and capacities . . . are presently unknown to Plaintiff."  FAC ¶ 3.  Plaintiff believes that the Doe Defendants are "in some way responsible for the damages herein alleged," and thus will seek leave of Court to amend the FAC when Doe Defendants' true names and capacities are discerned.  <u>Id.</u>

following individuals were present: Martha Boudreau
("Boudreau"), Chief Communications and Marketing
Officer; and Myrna Blyth ("Blyth"), Senior Vice
President and Editorial Director of Media.  Id. at ¶
23.  Meg Grant ("Grant"), a former AARP representative,
was present by telephone.  Id.  At the meeting, Rubin
and Weller pitched their long-term vision for
televising the MFGAs ("the Project").  Id. at ¶ 24.
They allegedly emphasized that a "long-term
arrangement" was necessary to ensure the MFGA's
continued success.  Id.

     Although AARP was initially reluctant to expend
money on the television production, Boudreau and other
representatives purportedly expressed enthusiasm for
the Project and moving forward with negotiations.  Id.
at ¶ 26.  Per Plaintiff, "[t]hey never mentioned that
they intended for the [P]roject to be a one-year deal
only."  Id.  Plaintiff also alleges that the AARP
representatives at the March 2015 meeting never
mentioned the following: a multi-year deal was a non-
starter, and on multiple occasions, they had previously
rejected offers for a multi-year production deal for
the MFGAs.  Id. at ¶ 26.  Nevertheless, AARP led
Plaintiff to believe it would negotiate a long-term
production deal.  Id.

     The parties continued to negotiate a long-term
agreement after the March 2015 meeting.  Id. at ¶ 27.
By June 2015, the parties realized that they would not

conclude negotiations in time to produce the 2016
MFGAs. Id. at ¶ 29. Accordingly, they entered into a
one-page stop-gap agreement (the "Agreement") to
continue engaging in good-faith negotiations regarding
a production deal. Id. at ¶ 30. The portion giving
rise to the breach of contract claim provides:

> If and when [Plaintiff] obtains guaranteed
> distribution commitments from television and/or
> cable stations to exhibit the First Program in
> no less than 50% of the United States Markets,
> then the parties shall attempt in good faith to
> complete negotiation of their agreement
> concerning the Programs . . . [i]f, however, by
> September 30, 2015 [Plaintiff] fails to obtain
> guaranteed distribution commitments from
> television and/or cable stations to exhibit the
> First Program in not less than 50% of the United
> states Markets, or if the parties fail to reach
> agreement as to the production and distribution
> of the Programs, then . . . the parties shall
> have no further obligation to each other . . .
> and the Proposal shall otherwise be deemed null
> and void.

FAC Ex. A., ECF No. 18-1.

After entering into the Agreement, Rubin secured a
meeting with WGN-America, a national broadcaster. Id.
at ¶ 35. WGN-America purportedly enthusiastically
expressed its commitment to televise the MFGAs
nationwide. Id. Per Plaintiff, it secured the
"requisite guaranteed distribution in over 50% of the
country." Id.

Sometime after this meeting, AARP allegedly
breached the Agreement. Blyth called Rubin and Weller,
subjected them to verbal abuse, and then AARP emailed
Plaintiff that it was no longer interested in a
possible deal with WGN-America. Id. at ¶ 36. In so

doing, AARP allegedly harmed Plaintiff's reputation and goodwill in the entertainment industry.  <u>Id.</u> at ¶ 38.

**B.  <u>Procedural Background</u>**

Plaintiff filed its First Amended Complaint ("FAC") on September 23, 2016 [18], and AARP filed a Motion to Dismiss the First Amended Complaint on October 11, 2016 [21].  The Opposition and Reply timely followed on November 1, 2016 and November 8, 2016 [22, 23].

## II. DISCUSSION

**A.  <u>Legal Standard</u>**

Federal Rule of Civil Procedure 12(b)(6) allows a party to move for dismissal of one or more claims if the pleading fails to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  A complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  Dismissal can be based on a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." <u>Balistreri v. Pacifica Police Dep't</u>, 901 F.2d 696, 699 (9th Cir. 1990).

In ruling on a 12(b)(6) motion, a court may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice.  <u>Swartz v. KPMG LLP</u>, 476 F.3d 756, 763 (9th Cir. 2007).  A court must presume all factual allegations of the complaint

to be true and draw all reasonable inferences in favor of the non-moving party.  Klarfeld v. United States, 944 F.2d 583, 585 (9th Cir. 1991).  The question presented by a motion to dismiss is not whether the plaintiff will ultimately prevail, but whether the plaintiff has alleged sufficient factual grounds to support a plausible claim to relief, thereby entitling the plaintiff to offer evidence in support of its claim.  Iqbal, 556 U.S. at 678; Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511 (2002).  While a complaint need not contain detailed factual allegations, a plaintiff must provide more than "labels and conclusions" or "a formulaic recitation of a cause of action's elements." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citation omitted).

**B.  Discussion**

    1.  Fraudulent Inducement

    Plaintiff alleges that AARP and its representatives fraudulently induced it to enter into the Agreement by (1) misrepresenting that it would engage in good-faith negotiations regarding a long-term production deal; and (2) failing to disclose that it never intended to undertake a multi-year deal.  FAC ¶¶ 26, 46.

    To state a claim for fraudulent inducement, a party must allege the following: (1) misrepresentation or omission; (2) knowledge of falsity; (3) intent to defraud; (4) justifiable reliance; and (5) resulting damage.  See Stewart v. Ragland, 934 F.2d 1033, 1043

1  (9th Cir. 1991).

2      If a claim sounds in fraud, it must comply with the

3  heightened pleading requirements in Federal Rule of

4  Civil Procedure 9(b).  See UMG Recordings, Inc. v.

5  Global Eagle Entm't, Inc., 117 F. Supp. 3d 1092, 1106

6  (C.D. Cal. 2015).  Plaintiff must provide "an account

7  of the time, place, and specific content of the false

8  representations as well as the identities of the

9  parties to the misrepresentations." Swartz v. KPMG

10  LLP, 476 F.3d 756, 764 (9th Cir. 2007).  Rule 9(b) asks

11  for an identification of the parties to the alleged

12  misrepresentations, putting defendant "on notice of the

13  specific conduct that forms the basis of the claim

14  against them." Chronic Tacos Enters., Inc. v. Chronic

15  Tacos Huntington Beach, Inc., No. SACV-10-1414 DOC

16  (RNBx), 2011 WL 1585594, at * 2 (C.D. Cal. April 26,

17  2011).  "Averments of fraud must be accompanied by 'the

18  who, what, when, where, and how' of the misconduct

19  charged." Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097,

20  1106 (9th Cir. 2003).

21      The Court now turns to whether Plaintiff has

22  adequately pled the elements of its fraudulent

23  inducement claim under Rule 9(b)'s more exacting

24  standards.

25          a.  *Misrepresentation or Omission*

26      The Court must decide whether AARP's omissions and

27  misrepresentations satisfy Rule 9(b).  Plaintiff

28  alleges that at the March 2015 meeting in Washington,

D.C., AARP representatives Boudreau, Blythe, and Grant "failed to disclose" that they only intended the televised production of the MFGAs to be a one-year deal and that they had repeatedly rejected previous offers for a multi-year production deal for the MFGAs. FAC ¶¶ 26, 46. They also actively misrepresented their willingness to engage in a long-term production deal. Id. at ¶ 46.

"Where a fraudulent omission is at issue, the requirements of Rule 9(b) are relaxed, but not eliminated." UMG Recordings, 117 F. Supp. 3d at 1107. This is because a plaintiff is unable to plead the specific time, place, and content of an omission. See Huntair, Inc. v. Gladstone, 774 F. Supp. 2d 1035, 1044 (N.D. Cal. 2011).

Recently, in Romero v. Securus Techs., Inc., ---F. Supp. 3d--- 2016 WL 6157953, at *9 (S.D. Cal. Oct. 24, 2016), plaintiff stated a claim for fraudulent concealment under Rule 9(b). Plaintiffs alleged that between April 2014 and August 2014 in San Diego, defendant's employee knew that the securities-company defendant was recording attorney-client calls but omitted this information, sidestepping its duty to disclose this information to victims and general public. Id. The allegations passed muster, as they pinpointed the "who, what, where, when, and how" required by Rule 9(b). Id.

Plaintiff alleges that at the March 2015

Washington, D.C. meeting, Boudreau, Blyth, and Grant
failed to mention the Project was only a one-year deal
and that they had fielded and rejected multi-year
offers for the Project.  Id.  This evinces the "when,
where, and who."  And Plaintiff does aver—albeit in a
convoluted way—that the omission is material because
AARP knew that "if [p]laintiff knew that (a) the best
AARP would ever consider doing was a single-year deal .
. . then Plaintiff would not have expended its time and
effort on the project."  FAC ¶ 48; Romero, 2016 WL
6157953, at *9 (defendant's duty to disclose the
recording of phone calls, and plaintiffs' allegation
that they would not have used defendants' services had
the omitted facts been disclosed, satisfied Rule 9(b))
(citation omitted).

While the purported omissions could possibly
satisfy Rule 9(b), Plaintiff's allegations are
railroaded by other deficiencies.  It bears repeating
that an omission does not obviate Rule 9(b), but rather
relaxes its standards.  UMG Recordings, 117 F. Supp. 3d
at 1107.  In Romero, the omission was material because
defendants gleaned private information about
plaintiffs—violating attorney-client privacy—that would
be material to plaintiffs and potentially the public.
By contrast, AARP's failure to disclose its stance on a
long-term deal strikes more at AARP's purported
nonperformance of its promise to enter into a multi-
year deal.  UMG Recordings, 117 F. Supp. 3d at 1108

("Mere nonperformance of a promise does not suffice to show the falsity of the promise.") (citations omitted). Plaintiff has not pled the "how/why" specificity; if anything, AARP's failure to disclose its intentions is more of a vehicle for Plaintiff to grouse about the ultimate failure of the Project and the Agreement.

Even if the alleged omissions satisfy Rule 9(b), AARP's spoken misrepresentations do not.  Plaintiff avers that AARP misrepresented its willingness to "engage in good-faith negotiations regarding a long-term production deal."  FAC ¶ 46.

AARP argues that Plaintiff cannot identify any specific false statement, let alone the speaker making the statement.  Def.'s Mot. to Dismiss ("Mot.") 10:1-9. The Court agrees.  When a corporation has committed a fraud, Rule 9(b) requires the plaintiff to "allege the names of the employees or agents who purportedly made the fraudulent representations or omissions, or at a minimum identify them by their titles and/or job responsibilities."  UMG Recordings, 117 F. Supp. 3d at 1108 (citing U.S. ex rel. Lee v. SmithKline Beecham, Inc., 245 F.3d 1048, 1051 (9th Cir. 2001)).  The plaintiff should also allege the individuals' "authority to speak, to whom they spoke, what they said or wrote, and when it was said or written."  Id. at 1107.

At first glance, Plaintiff's allegations are adequate.  Plaintiff generally identifies that

10

Boudreau, Blyth, and Grant were present at the March
2015 Washington, D.C. meeting, and sets forth their job
titles (e.g., Chief Communications and Marketing
Officer).   FAC ¶¶ 22-23.   But cracks begin to show in
Plaintiff's allegations when it uses the collective
"they" or "AARP" to state that the corporation
generally, or its representatives, failed to disclose
their disinterest in a long-term deal.   Not only does
Plaintiff fail to indicate who—among Boudreau, Blythe,
and Grant—communicated what, but also Plaintiff fails
to specify what was said, instead generally averring
that "AARP [represented] it would engage in good faith
negotiations regarding a long-term production deal."
FAC ¶ 46.   Were the Court to sign on to Plaintiff's
reasoning, any plaintiff could generally mention
employees/representatives present at a meeting, specify
their job titles, and then vaguely mention a
misrepresentation.   This is simply not enough under
Rule 9(b).   Moreover, the Rule 9(b) specificity
framework is in place to prevent this kind of unchecked
fact pleading from happening.

     Plaintiff's allegations also fail under Rule 9(b)
because they lack the specific content of the
fraudulent representations or why the statements were
false when made.   In UMG Recordings, defendant
fraudulently promised to continue distributing
plaintiff's recordings for in-flight entertainment use,
and the parties concurred that an "agreement" would

follow.  Id. at 1107.  These representations were not
sufficiently specific in content.  Plaintiff did not
provide details about the terms of this hazy
"agreement," and only vaguely asserted that "the
parties agreed [to] continued use of the sound records
for an indefinite period."  117 F. Supp 3d at 1107.
Like the vague "agreement" defendant conceded to in
UMG, AARP agreed to engage in future "good-faith
negotiations" with Plaintiff.  FAC ¶ 46.  And
similarly, Plaintiff does not detail the contours of
these good-faith negotiations that AARP allegedly
promised to undertake.[2]

     b.  *Knowledge of Falsity and Intent to Defraud*
    Plaintiff avers that AARP knew it had no intention
to enter into a multi-year deal to produce the MFGAs,
FAC ¶ 47.  Plaintiff also avers the following
circumstantial evidence of AARP's knowledge and intent:
(1) AARP knew at least in March 2015 that Plaintiff was
only interested in a long-term deal; (2) AARP actively
engaged Plaintiff after the March 2015 meeting, leading
it to believe in its commitment to a long-term deal;
(3) AARP later breached the Agreement; (4) Blyth
verbally berated Plaintiff to inform it that AARP would

---

[2] To be fair, the parties here had an Agreement detailing
contingencies should Plaintiff secure national broadcasting,
unlike the lack of an agreement altogether in UMG.  But a
substantive agreement does not fix the lack of detail inherent in
the allegation that AARP would engage in "good-faith
negotiations."

no longer negotiate; (5) and AARP explored alternative
production arrangements after breaching the Agreement.
FAC ¶ 49.

Knowledge and intent can be averred generally under
Rule 9(b).  Fed. R. Civ. P. 9(b) ("Malice, intent,
knowledge, and other conditions of a person's mind may
be alleged generally.")  Effectively, the plaintiff
should explain why the disputed statement was false
when it was made, see <u>UMG Recordings</u>, 117 F. Supp. 3d
at 1107, and "point to facts which show that defendant
harbored an intention not to be bound by the terms of
the contract at formation." <u>Nikoonahad v. Rudolph
Techs., Inc.</u>, C 08-2290 JF (PVT), 2008 WL 4065831, at
*4 (N.D. Cal. Aug. 27, 2008) (citation omitted).

It is unclear how AARP harbored the requisite
intent and knowledge at the time of contract formation,
anywhere between June and July 2015.[3]  Plaintiff's focus
on the March 2015 meeting in Washington D.C. is
specious and distracting.  Even accepting March 2015 as
the key time window for AARP's purportedly nefarious
conduct, it is difficult to reconcile AARP's March 2015
intent not to enter into a long-term agreement with its
contradictory "earnest" efforts to negotiate a long-
term agreement from March 2015 to June 2015, when the

---

[3] Because the contract at issue was formed between June
2015—the date of the proposal—or even as late as July 2015, FAC
¶¶ 28-31, when the parties reviewed their "AARP Awards
Preliminary Deal Memo," the Court focuses its attention on AARP's
intent and knowledge at that time.

parties continued negotiations.  FAC ¶¶ 27-28, 30, 49
("[T]he negotiation of a long-term agreement commenced
in earnest . . . AARP actively and continuously engaged
with Plaintiff, both during the [March 2015] meeting
and after.").  The link between these allegations is
tenuous at best.  Plaintiff needs at least some
specific indication that AARP never intended to
engineer a long-term deal; for instance, a statement
from AARP that they "knew it all along."  In re
Glenfed, Inc. Sec. Litig., 42 F.3d 1541, n.9 (9th Cir.
1994), superseded by statute on other grounds by,
Johnson v. Wal-Mart Stores, Inc., 544 F. App'x 696 (9th
Cir. 2013).[4]

The Court is cognizant that weighing contradictions
between Plaintiff's allegations treads into summary
judgment territory; as such, these contradictions do
not carry the day in the Court's analysis.
Nevertheless, internal inconsistencies between
Plaintiff's allegations places them in tension with the
facial plausibility required in Twombly/Iqbal and

---

[4] Plaintiff's theory is that AARP kept up a "ruse, since the
March 2015 meeting, of pretending it was interested in a long-
term deal . . . to induce [Plaintiff to sign the July 2015
Agreement]."  Opp'n 10:8-10.  But various inconsistences
undermine this theory.  Plaintiff argues that AARP did not
disclose its unwillingness to strike a long-term deal, yet in the
same breath alleges that as early as late 2014, before the
February 2015 MFGAs, AARP was "initially uncertain" and
"reluctant" to commit to a multi-year deal.  FAC ¶¶ 16, 25.  If
anything, this inconsistency shows that Plaintiff was perhaps on
some notice that AARP was not fully on board with a long-term
deal.

jettisons them more into the realm of speculative allegations.  And the inconsistencies undercut Plaintiff's insistence that AARP knew and intended all along to fraudulently induce Plaintiff into the Agreement.

The most compelling reason why Plaintiff fails to state a claim under the "knowledge/intent to induce" elements is because Plaintiff attempts to recast its breach of contract claim as a fraudulent inducement claim.  "Something more than nonperformance is required to prove the defendant's intent not to perform his promise."  Tanedo v. East Baton Rouge Parish School Bd., No. SA CV10-01172 JAK, 2012 WL 5447949, at *7 (C.D. Cal. Oct. 4, 2012).  "[M]ere failure to perform a contract does not constitute fraud."  Richardson v. Reliance Nat'l. Indem. Co., No. C 99-2952 CRB, 2000 WL 284211, at *4 (N.D. Cal. Mar. 9, 2000).  Otherwise, "every breach of contract claim would support a claim of fraud so long as the [plaintiff] adds to his complaint a general allegation that the defendant never intended to keep her promise."  Tanedo, 2012 WL 5447959, at *8 (citations, internal quotation marks, and alterations omitted).

For instance, AARP's "complete disregard[]" for the Agreement, Blyth's verbal tirade against Plaintiff before truncating the contract, and AARP's later alleged pursuit of alternative production arrangements are all part and parcel of AARP's non-performance of

the Agreement.   The center of gravity should be AARP's
intent at the time of contract formation, not
allegations of AARP's breach after the fact.   Plaintiff
channels its disappointment over the failed Project to
retroactively accuse AARP of fraudulent inducement in
the most general of averments.   This is insufficient to
plead knowledge and intent.

> c.   *Justifiable Reliance and Resulting Damage*

"Reliance exists when the misrepresentation or non-
disclosure was an immediate cause of the plaintiff's
conduct which altered his or her legal relations, and
when without such misrepresentation or non-disclosure
he or she would not, in all reasonable probability,
have entered into the contract or other transaction."
City Solutions, Inc. v. Clear Channel Commc'ns., 365
F.3d 835, 840 (9th Cir. 2004) (citation omitted).
Plaintiff argues that he has expended a "substantial
amount of time" discussing the Project with AARP and
its representatives, flying to D.C. for a lengthy
meeting, and entering into the Agreement.   FAC ¶ 50.

Plaintiff's alleged reliance is specific enough and
justifiable under Twombly/Iqbal's general averments,
but the Court has difficulty discerning whether the
allegedly fraudulent misrepresentations and omissions
were the "sole or even the predominant or decisive
factor in influencing [Plaintiff's] conduct." City
Solutions, 365 F.3d at 840 (citation omitted).
Assuming for the moment that AARP indeed made

16

misrepresentations, Plaintiff's reliance in the form of investing time and effort may nevertheless have been influenced in part by AARP's initial "hesitation" to negotiate, rather than its misrepresentations.  See FAC ¶ 25 ("Recognizing AARP's reluctance to spend substantial funds on the television production, [Plaintiff] presented a budget [at the March 2015 meeting].")  Nonetheless, Plaintiff has at least facially demonstrated the plausibility of its justifiable reliance.[5]

       d.  *Economic Loss Doctrine*

Aside from failing under the Rule 9(b) specific pleading standards, Plaintiff's fraudulent inducement claim is barred by the economic loss doctrine.  The economic loss doctrine provides that "no tort cause of action will lie where the breach of duty is nothing more than a violation of a promise which undermines the expectations of the parties to an agreement."  JMP Secs. LLP v. Altair Nanotechs. Inc., 880 F. Supp. 2d 1029, 1042 (N.D. Cal. 2012).  The policy behind the rule is to "prevent every breach of contract from giving rise to tort liability and the threat of

---

[5] The "resulting damages" element is on shakier ground. Plaintiff allegedly has lost goodwill "generated over decades in Hollywood" and has also suffered "severe[] harm[] to [its] reputation," detrimentally affecting its ability to get future projects.  FAC ¶¶ 33, 38.  While Plaintiff plausibly alleges damages, the resulting damages are problematically intertwined with the contract claim damages, and likely barred under the economic loss doctrine, as discussed in infra Part II.B.1.d.

1  punitive damages." Id. at 1042.

2      In Altair, defendant hired JMP as its financial

3  advisor, but allegedly did not "make good on its

4  promise to pay JMP its contingent fee" after JMP

5  facilitated a transaction. Id. at 1033. JMP sued for

6  fraud, claiming Altair misrepresented it would pay

7  certain fees, but knowing full well that it would not.

8  Id. The court applied the economic loss doctrine,

9  explaining that JMP took its allegations for a

10 "straightforward claim for breach of commercial

11 contract" and "recast them as torts." Id. at 1043.

12 Altair's alleged conduct was not sufficiently deviant

13 to warrant tort remedies. Instead, the parties'

14 dispute was whether JMP was owed 1.5% commission or a

15 4% commission; effectively, a claim that Altair broke

16 its promises in bad faith. Id. at 1044.

17     Plaintiff's fraudulent inducement claim fails under

18 the economic loss doctrine. Plaintiff has not

19 identified any independent duty AARP had to furnish it

20 with a long-term production deal. Hannibal Pictures,

21 Inc. v. Sonja Prods. LLC, 432 F. App'x 700, 702 (9th

22 Cir. 2011)("Purported tort claims related to the

23 performance of a contract are viable only where the

24 duty that gives rise to tort liability is either

25 completely independent of the contract or arises from

26 conduct which is both intentional and intended to

27 harm")(emphasis in original).

28     Moreover, Plaintiff has not established that AARP's

18

conduct was intentional or intentionally harmful, as
discussed in _supra_ Part II.B.1.b.  On its face, the
Agreement shows that the allegedly fraudulent
claims—that AARP would good-faith negotiate a possible
long-term deal—are intertwined with the substance of
the Agreement.  FAC Ex. A ("If and when [Plaintiff]
obtains guaranteed distribution commitments from
television and/or cable stations to exhibit the First
Program . . . then the parties shall attempt in good
faith to complete negotiation of their agreement
concerning the Programs.")  Plaintiff also collapses
the remedies sought under both the contract and tort
claims; for both, Plaintiff claims that it has suffered
reputational harm and lost goodwill in its industry.
FAC ¶¶ 38, 39 ("Plaintiff never would have incurred
those costs and would not have lost those opportunities
had it known that AARP did not intend to negotiate in
good faith and abide by its promises.")  As in _Altair_,
Plaintiff's fraudulent inducement claim is a thinly
veiled attempt to seek the same remedies for the
contract claim and to punish AARP for its
nonperformance under the contract.

Based on the above, the Court **GRANTS** AARP's Motion
to Dismiss as to the fraudulent inducement claim.

2.  Breach of Contract

Plaintiff argues that it has satisfied the

///

///

condition precedent[6] under the Agreement by meeting with
WGN-America, who "enthusiastically expressed its
commitment to televise the show nationwide . . .
Plaintiff had secured from WGN-America the requisite
guaranteed distribution in over 50% of the country."
Id. at ¶ 35.  Plaintiff alleges that AARP breached the
Agreement by failing to complete negotiations after the
successful meeting.  FAC ¶ 42.

The key inquiry for the Court is whether Plaintiff
has pled performance or occurrence of a condition
precedent.  Per Federal Rule of Civil Procedure 9(c),
"it is sufficient to aver generally that all conditions
precedent have been performed or have occurred."  But
"denial of performance or occurrence shall be made
specifically and with particularity."  Fed. R. Civ. P.
9(c).

Plaintiff relies on Kieran v. Zurich Cos., 150 F.3d
1120, 1123-24 (9th Cir. 1998), where a plaintiff did
not specifically allege that he signed a waiver, which
was a condition precedent to the "Parasailing
Warranties" provision.  Nonetheless, he alleged that

---

[6] As previously mentioned, the Agreement provided that once
Plaintiff obtained "guaranteed distribution commitments from
television and/or cable stations to exhibit the First Program in
no less than 50% of the United States Markets," then the parties
would attempt in good faith to complete negotiations.  FAC Ex. A.
But if Plaintiff was unable to garner distribution commitments
"in not less than 50% of the United states Markets, or if the
parties fail to reach agreement as to the production and
distribution of the Programs" by September 30, 2015, then the
parties would "have no further obligation to each other."  Id.

the parasailing accident took place "while the policy
was in full force and effect," indicating to the Court
that he must have satisfied all the conditions
precedent.  Id. at 1124.  The court concluded that
"[t]his general statement is an adequate averment under
the loose guidelines of Rule 9(c)."  Id.

The standards for pleading a condition precedent
are lax.  As such, the Court is persuaded that
Plaintiff's FAC can survive at least as to this claim.
Ruiz Food Prods. v. Catlin Underwriting U.S., Inc., No.
1:11-cv-00889 OWW DLB, 2011 WL 3323046, at *4 (E.D.
Cal. Aug. 2, 2011) (motion to dismiss denied for
allegation that "[p]laintiff has performed all
obligations required of it to be performed under the
terms of the Policy" was a general allegation of full
performance).  Even though Plaintiff could have
generally alleged it satisfied the condition precedent,
it pled that "it secured from [WGN] the requisite
guaranteed distribution in over 50% of the country.
Now the good-faith negotiations should have begun in
earnest."  FAC ¶ 35.  Under the relaxed pleading
standards of Rule 9(c), and in light of Kieran, this
allegation is enough to show that Plaintiff performed
the condition precedent of obtaining guaranteed
distribution commitments in at least 50% of the U.S.
Markets.  FAC Ex. A.

AARP's argument that "[WGN's] [e]nthusiastic
expression of commitment is not a guarantee," and its

focus on the lack of facts showing guaranteed
distribution by the September 30 deadline, Mot. 20:8-
10, does not convince the Court that Plaintiff's
allegations are defective.  Effectively, AARP tries to
import Rule 9(b)'s heightened pleading requirements
onto the contract claim and extract meaning from
Plaintiff's allegations; this demands "a factual
analysis that is not appropriate at the motion to
dismiss stage." City & Cnty. Of S.F. v. Tutor-Saliba
Corporation, No. C 02-5286 CW, 2005 WL 645389, at *19
(N.D. Cal. Mar. 17, 2005).  A motion to dismiss does
not ask whether Plaintiff will prevail in the action,
but whether Plaintiff is entitled to offer evidence in
support of its claim. Swierkiewicz v. Sorema N.A., 534
U.S. 506, 511 (2002).  Plaintiff's allegations of a
satisfied condition precedent are sufficient to survive
a motion to dismiss, and the issue of breach of
contract shall be further explored in discovery.

Therefore, the Court **DENIES** AARP's Motion to
Dismiss for the breach of contract claim.

3.  Whether the Doe Defendants Should be Dismissed

AARP argues that the claims against the Doe
Defendants should be dismissed as the FAC fails to
allege facts or specific claims regarding any unknown
individuals.  Mot. 22:9-10.  And it is unlikely that
discovery will reveal Doe Defendant identities.  Reply
14:6-7.  Plaintiff counters that the Doe Defendants are
relevant and create a substantive right under

California Code of Civil Procedure §§ 474, 583.210 to
"substitute real defendants for Does for three years
after filing the complaint . . . ." Opp'n 13:5-14.

As "a general rule, the use of John Doe to identify
a defendant is not favored in federal court." <u>Gillespie
v. Civiletti</u>, 629 F.2d 637, 642 (9th Cir. 1980).
Unlike under California law, there is no provision in
the Federal Rules permitting the use of fictitious
defendants.[7] <u>Id.</u> Pleading Doe Defendants is disfavored,
as the court cannot determine that it is a real person
or entity that can be sued in federal court, or
determine if plaintiff's suit could survive a Doe
Defendant's motion to dismiss. <u>Lee v. Plummer</u>, No.
C-04-2636 VRW, 2005 WL 91380, at *5 (N.D. Cal. Jan. 17,
2005).

Plaintiff has not pled enough facts to maintain its
unnamed Doe Defendants. <u>Galindo v. City of San Mateo</u>,
No. 16-cv-03651-EMC, 2016 WL 7116927, at *10 (N.D. Cal.
Dec. 7, 2016) (allegation that one or more Doe
Defendants was responsible for the hiring and
supervising other defendants was not enough, nor was
only mentioning Doe Defendants in headings or after
other defendants' names). Plaintiff's allegation is
even more conclusory than in <u>Galindo</u>; it only alleges

---

[7] Pleading Doe Defendants is not *per se* prohibited in
federal court. L.R. 19-1 (limiting parties from pleading no more
than ten "Doe or fictitiously named parties.") Rather, there is
no affirmative substantive right to plead Doe Defendants, as in
California law.

that the "true names and capacities" of Does 1-10 are
"presently unknown to Plaintiff . . . [but] each of the
Doe defendants is in some way responsible for the
damages herein alleged."  The Court agrees with AARP
that Plaintiff has likely adduced all individuals
allegedly responsible for the fraudulent inducement
claims at the March 2015 meeting.  Mot. 13:22-27.  And
it is unlikely that Plaintiff can allege any new,
unknown individual engaging in independent misconduct
at the meeting.  Thus, the Court **GRANTS** the Motion to
Dismiss as to all claims against the Doe Defendants.

    4.  Leave to Amend

    Federal Rule of Civil Procedure 15(a) provides that
a party may amend their complaint once "as a matter of
course" before a responsive pleading is served.  Fed.
R. Civ. P. 15(a).  After that, the "party may amend the
party's pleading only by leave of court or by written
consent of the adverse party and leave shall be freely
given when justice so requires."  Id.  "Rule 15's
policy of favoring amendments to pleadings should be
applied with extreme liberality."  United States v.
Webb, 655 F.2d 977, 979 (9th Cir. 1981) (internal
quotations omitted).  But if in a motion to dismiss,
any amendment to the pleadings would be futile, leave
to amend should not be granted.  Bush v. Liberty Life
Assurance Co. of Boston, 77 F. Supp. 3d 900, 906-07
(N.D. Cal. 2015).

    Plaintiff should have leave to amend its fraudulent

inducement claim, to flesh out which AARP employees
induced it to enter the contract and what, precisely,
they said that was misleading.  Plaintiff may also
distinguish the remedies for its tort claim from its
contract claim, to shore up the economic loss doctrine
problem.  The Court also gives Plaintiff leave to
provide the court with the identities of the Doe
defendants, or with specific factual information
identifying them.

### III. CONCLUSION

Based on the foregoing, the Court grants in part
and denies in part AARP's Motion to Dismiss.  The
Motion to Dismiss is **GRANTED** as to the fraudulent
inducement claim and as to Doe Defendants 1-10 **WITH 14
21 DAYS LEAVE TO AMEND**.  The Court **DENIES** AARP's Motion
to Dismiss as to the breach of contract claim.

**IT IS SO ORDERED.**


DATED: December 16, 2016      s/ RONALD S.W. LEW

                              **HONORABLE RONALD S.W. LEW**
                              Senior U.S. District Judge